# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| **ANTHONY T. LEE, et al.,** } | |
| } | |
| **Plaintiffs,** } | |
| } | |
| **UNITED STATES OF AMERICA,** } | |
| } | |
| **Plaintiff-Intervenor** } | |
| **and Amicus Curiae,** } | Master Case No.: 2:70-CV-251-RDP |
| } | |
| **NATIONAL EDUCATION** } | (This document relates to: |
| **ASSOCIATION, et al.,** } | Decatur City School System |
| } | Case No. 5:18-mc-898-RDP) |
| **Plaintiff-Intervenor,** } | |
| } | |
| **v.** } | |
| } | |
| **MACON COUNTY BOARD OF** } | |
| **EDUCATION, et al.,** } | |
| } | |
| **Defendants.** } | |

## MEMORANDUM OPINION AND ORDER

On July 25, 2008, the Decatur City Board of Education ("Decatur") filed a Motion for Declaration of Unitary Status. After discovery, comprehensive briefing and two fairness hearings, on July 3, 2012, the court granted the Motion in part and denied it in part. The court declared the Decatur City School System to be unitary in all respects *except* in the area of Faculty and Staff Assignment.[1] The court dissolved all outstanding orders and injunctions, except as related to the

---

[1] The Supreme Court has set forth six areas (the *Green* factors) which must be considered as part of the determination of whether a school district has eliminated the vestiges of de jure desegregation to the extent practicable and attained unitary status. These areas are: Student Assignment, Faculty Assignment, Staff Assignment, Transportation, Extracurricular Activities, and Facilities. *Green v. School Bd. of New Kent County*, 391 U.S. 430, 473-74 (1968); *Freeman v. Pitts*, 503 U.S. 467, 492 93 (1992).

assignment of faculty and staff in the Decatur City schools. The court concluded that it would be necessary to monitor faculty and staff assignments for an additional period of time.

On June 12, 2019, after allowing time for a new hiring procedure to be implemented and its results assessed, the court conducted a fairness hearing addressing the area of Faculty and Staff Assignment. Plaintiff-Intervenor and Amicus Curiae, the United States, has stated that it has no objection to a declaration of unitary status in the area of Faculty Assignment, and that "a declaration of unitary status by [the court] would be appropriate." (Case No 5:18-mc-00898-RDP, Doc. # 12 at 11).

**I.   Background**

This case relating to the Decatur City Schools is part of a state-wide action against numerous Alabama school districts alleging that the state operated a compulsory segregated school system in violation of the Fourteenth Amendment. *See Lee v. Macon Co. Bd. of Education*, 267 F.Supp. 458 (M.D. Ala. 1967). On March 26, 1970, the court entered an order approving a desegregation plan for Decatur's schools.

As noted in the court's July 3, 2012 Order, following numerous conferences among the parties to this litigation and the court's approval, the parties agreed on new hiring procedures. Decatur implemented these new hiring procedures for the 2009-2010 school-year.

At the October 19, 2011 Fairness Hearing, evidence was presented regarding Decatur's implementation of the new procedures and its efforts to recruit minorities. That evidence showed that the use of computer-based employment programs had successfully expanded the pool of minority applicants. The evidence also showed that Decatur had achieved the appropriate *Singleton* ratio in faculty assignments. *Singleton v. Jackson Municipal Separate School Dist.*, 419

F.2d 1211 (5th Cir. 1969), *cert denied* 396 U.S. 1032 (1970).[2] However, testimony at the hearing indicated that Decatur continued to assign certified staff pursuant to the provisions of *Singleton*. That is, the evidence presented at the 2011 hearing showed that, even after the appropriate *Singleton* ratio had been achieved, race was still considered in faculty assignments to maintain no more and no less than a particular, rigid variance from that ratio.

The parties agreed faculty hiring and assignment procedures, which have been in effect since 2009, are as follows

    a.    <u>Job Announcements</u>. Job announcements are posted on the websites of the Alabama State Department of Education and the Decatur School System.

    b.    <u>Application Collection</u>. Decatur retrieves all applications from the electronic SearchSoft (Hire Enterprise) database. If Decatur were to receive hard copies of applications directly, it would direct the applicant to use the database. All applications received for the various job announcements are categorized by their corresponding job announcement identifier, reviewed and maintained in a centralized database that includes the following sortable/searchable data fields: position applied for, date of application received, highest degree obtained, certifications, highly qualified status, previous work experience, special training or other work related experience. In addition, all applications for the job announcement include a request that the applicant voluntarily identify his/her race within the form.

---

[2] *Singleton* requires that the racial composition of the faculty at each of a school district's schools should approximate the racial composition of the faculty within the entire system.

c. <u>Application Intake</u>. Applicants respond to (1) a general job announcement, and/or (2) a school-specific job announcement. Decatur uses a general job announcement to secure candidates before an actual teaching position becomes available at one of its schools. For example, Decatur will post a job announcement for a position, such as a Second Grade Teacher, in anticipation that, based on enrollment projections, it will have a need for that position at one of its schools. Decatur will post a school specific job announcement when a principal and/or supervisor currently has a need for a position.

d. <u>Pre-Screening Interview Process</u>. Applicants who meet the threshold general job announcement requirements receive an email requesting that they participate in a pre-screening interview. Certified personnel must participate in a pre-screening interview. Interviews are conducted by two or three principals and/or supervisors using a standardized pre-screening interview instrument consisting of at least three preliminary questions and a scoring scale from 0-30 points. Decatur makes a concerted effort to have a diverse interview team comprised of principals and/or supervisors. The principals rank each applicant and submit an application packet containing a written evaluation of each candidate.

Next, Decatur catalogs each application packet and a representative from the central office reviews the packet to ensure that each candidate has met the requirements of that job announcement. Decatur then uses these evaluations to create a preliminary applicant pool. Candidates who receive a score of 18 or above are designated as "HR Recommended," signaling to principals/supervisors that the candidate has successfully completed the pre-screening process and is eligible to interview for open positions. When

a school principal and/or supervisor posts a job announcement, he/she can view the database and see an applicant list that includes candidates from the pre-screening interview applicant pool as well as candidates that were not pre-screened and may be responding to that school specific job announcement. If a candidate has not been pre-screened, the candidate cannot be considered until he or she goes through pre-screening.

    e.  <u>Applicant Selection</u>. Principals/supervisors use the on-line data base system (SearchSoft) to search for eligible applicants to fill open positions using non-discriminatory, job related criteria. Decatur has instructed principals/supervisors to select and interview at least ten applicants from the central office's applicant pool, including the pre-screened applicants (the "interview pool") for a job posting, unless the central office's applicant pool itself does not contain ten applicants. If fewer than ten applicants apply for a position, or fewer than ten applicants are HR recommended, then a notation is made on the "analysis log" of the "candidate recommended for hire" and on the "recommendation for employment" form.

  Principals/supervisors are required to use the standardized interview instrument(s) that are pre-loaded in Decatur's SearchSoft database. In addition to the standardized questions on the interview instrument, principals/supervisors may ask five additional questions that are germane to the specificity of the position to gain a deeper understanding of the applicant's knowledge base and/or skill set as necessary and appropriate. The principal/supervisor then uses Decatur's standardized interview

instrument to rank each candidate within the interview pool using a 0-10 point scale, and selects the most "highly qualified" applicant.

Next, the principal makes a recommendation to hire a particular candidate by sending the Human Resource supervisor an electronic "request to hire" form and a "recommendation for employment form." The recommendation form includes (1) a justification for selecting that candidate, (2) a list identifying each applicant interviewed, including that applicant's race, and (3) the interview scores of all the applicants for that job announcement. Decatur, or its designated representative, reviews the principal's recommendation to ensure that the applicant is certified, has a degree, is qualified to teach in the field, and that all candidates were adequately evaluated/considered. After reviewing the principal's recommendation, Decatur conducts a background check and makes a recommendation to the Board to either accept or reject the recommendation.

f. <u>Application Maintenance</u>. Applications are maintained and available for consideration by Decatur for a three-year period from the date of submission. Decatur retains all applications and written records evidencing review of the applications in a central location.

(Case No 5:18-mc-00898-RDP, Docs. # 11, 12, 13, 18, 19).

On February 27, 2019, the court set a fairness hearing for June 12, 2019. (Doc. # 9). Prior to the hearing, the Decatur provided notice by publication in a local newspaper for three consecutive weeks. (Doc. # 23-1). Community members were provided the opportunity to provide written objections and/or comments on the Decatur's request for unitary status. The court received three responses. (Docs. # 14, 15, 20).

At the June 12, 2019 Fairness Hearing, the court heard testimony from Dr. Yvette Evans, Decatur's Deputy Superintendent of Instruction and Personnel, regarding these hiring procedures. The court notes that all parties are in agreement that the faculty hiring and assignment procedures meet constitutional standards. The process is objective and non-discriminatory, selections are based on merit, and (since the 2011 fairness hearing) race is not considered.

Dr. Evans testified that Decatur participates in college recruitment and job fairs to attract applicants for employment. For example, in the Spring of 2019, Decatur sent recruitment personal to Alabama State University, Athens State University, Auburn University, Samford University, University of Alabama, University of North Alabama, and University of West Alabama. It now holds its own job fair. Brochures and/or placards have been developed as a recruiting tool and are distributed at job fairs and given to prospective candidates. The school system advertises in such publications and websites as (1) "Minorities for Success," (2) Historically Black Colleges/Universities on-line/on-campus Resource and (3) in the Nashville and North Alabama Teacher Consortium Recruitment Day Brochure. A letter, which is used as a recruitment tool, is housed on the Decatur City Schools website at [www.dcs.edu](www.dcs.edu) with instructions on how to complete an application. (Doc. # 13 at 5).

Dr. Evans testified that despite these efforts, Decatur has experienced difficulty recruiting young minority applicants in competition with other urban areas. She explained that the urban school districts nearby tended to reduce the candidate pool available for hire by Decatur Schools.

At the hearing, the court also heard from the individuals who had filed objections, as well as one other member of the public who had not objected. For the most part, the concerns expressed did not directly relate to faculty assignments.

## III. Analysis

The purpose of court supervision of a desegregation case is to convert a discriminatory school system – *i.e.*, one that violates the United States Constitution because it is a *de jure* segregated school system -- to a system which has schools that are not racially segregated. *See Green v. Co. School Bd. of New Kent*, 391 U.S. 430, 442 (1968). The Supreme Court intended for federal supervision of local school systems to be a temporary measure. *Board of Educ. of Oklahoma City v. Dowell*, 498 U.S. 237, 247 (1991). "[T]he ultimate objective [is] to return school districts to the control of local authorities." *Freeman v. Pitts*, 503 U.S. 467, 489 (1992). "[T]he court's end purpose must be to remedy the violation and, in addition, to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution." *Freeman*, 503 U.S. at 489. If a school system is successful in this effort, it may be declared "unitary," and control returned to the local school board. *Id.* at 486-87.

The burden of proving that the school system has achieved unitary status is placed squarely on the shoulders of the School Board. *See Lee v. Etowah Co. Bd. of Educ.*, 963 F.2d 1416, 1424 (11th Cir. 1992). To show it is entitled to dismissal of a school desegregation case and to come out from under federal court supervision, a school district much show that (1) it has fully and satisfactorily complied with the court's decrees for a reasonable period of time, (2) that the vestiges of past discrimination have been eliminated to the extent practicable, and (3) that it has demonstrated a good-faith commitment to the whole of the court's decrees and to those

provisions of the law and the Constitution that were the predicate for judicial intervention. *Missouri v. Jenkins*, 515 U.S. 70, 87-89, (1995*); Bd. of Educ. of Oklahoma City Pub. Sch. v. Dowell*, 498 U.S. 237, 249-50 (1991). "To determine if a school board has shown a good faith commitment to a desegregation plan, a district court should, among other things, consider whether the school board's policies 'form a consistent pattern of lawful conduct directed to eliminating earlier violations.'" *Lockett v. Bd. of Educ. of Muscogee Cty. Sch. Dist., Ga.*, 111 F.3d 839, 843 (11th Cir. 1997) (citation omitted). The good-faith showing has two components: a school district must show not only past good-faith compliance, but also a good-faith commitment to the future operation of the school system through "specific policies, decisions, and courses of action that extend into the future." *Dowell v. Bd. of Educ. of the Oklahoma City Pub. Sch.*, 8 F.3d 1501, 1513 (10th Cir. 1993).

The parties developed and agreed upon the procedures for faculty hiring, recruitment and assignment. Those procedures were implemented for the 2009-2010 school year. At the 2011 fairness hearing, there was testimony which indicated that the agreed-upon plan had not been properly implemented.[3] More specifically, there was evidence that even after the appropriate *Singleton* ratio was achieved, race was still considered in faculty assignments to maintain no more and no less than a particular, rigid variance from that ratio.

"*Singleton* does not require that such ratios be maintained permanently; rather, it 'contemplates an initial reassignment so that the racial ratio at every school reflects the

---

[3] There was testimony at the 2011 hearing that principals did not always follow the hiring process (2011 Tr. 58:5 59:8), use the 0 to 10 scoring/ranking scale (2011 Tr. 27:5 9), interview candidates who are certified (2011 Tr. 112:2 3), or select the candidate that would be considered, based on Decatur's scoring rubric, the most qualified (2011 Tr. 61:13 62:8, 64:22 65:4). Several principals testified that they were not accurately entering hiring data information into or fully utilizing Decatur's computerized database. (2011 Tr. 52:16 23, 53:5 16). There was also

9

systemwide ratio, followed by the utilization of a non-discriminatory hiring, firing, and assignment policy thereafter.'" *United States v. DeSoto Parish School Bd.*, 574 F.2d 804, 819 (5th Cir. 1978)[4] (quoting *United States v. Wilcox County Bd. of Educ.*, 494 F.2d 575, 580 (5th Cir. 1974), *cert. denied*, 419 U.S. 1031.) "The law in this circuit is quite clear: after faculty desegregation has been effectuated by remedial orders based on racial ratios the school board cannot continue to make personnel decisions on the basis of such racial ratios." *Lee v. Russell County Bd. of Ed.*, 563 F.2d 1159, 1163 (5th Cir. 1977) (citing *Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424 (1976) (once a unitary system is achieved, the school system cannot continue to intervene in order to preserve a racial balance)).

Following the 2011 fairness hearing, Decatur was allowed additional hiring cycles to properly implement the procedures. Decatur submitted yearly reports on faculty hiring and assignment to the court, which the court has reviewed. Since the 2011 hearing, and after reaching the appropriate *Singleton* ratio, Decatur has exhibited compliance with the principle of racial equality and demonstrated that it will not suffer intentional discrimination in the future. Decatur has implemented a transparent, non-discriminatory, merit based selection procedure and has stated its intention to continue adherence to the procedure. Moreover, Decatur has adopted a resolution demonstrating its good faith commitment that it will not discriminate in the operation of its school system. (Doc. # 21-2); *see Brown v. Board of Educ. of Topeka*, 978 F.2d 585, 591 (10th Cir. 1992) (school board's resolution declaring intention to comply with Constitution in the

---

evidence that Decatur was not properly overseeing the hiring process at the schools.

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

future is some evidence of good faith), *cert. denied*, 509 U.S. 903 (1993). Testimony at the 2019 fairness hearing established that the agreed-upon hiring procedures have been properly implemented, and that they have been, and are being, used in a non-discriminatory manner.

Decatur provided public notice of the June 12, 2019 fairness hearing by publication in the Decatur Daily, posting notice in the Decatur schools and the central office, and by posting a link on the District's website. Three objections were filed with the court, and four Decatur citizens spoke at the fairness hearing. None of the issues raised by the citizens reflected any deficiencies in the hiring and assignment procedures. Decatur has carried its burden to show that it has achieved unitary status.

## IV.  CONCLUSION

For all of the foregoing reasons, the court believes that dismissal of this school desegregation case is appropriate here. The remaining portion of the Decatur City Board of Education's Motion for Declaration of Unitary Status is **GRANTED**. The Decatur City School System is **DECLARED** to be unitary in all respects *including* in the area of Faculty and Staff Assignment. All outstanding orders and injunctions are **DISSOLVED** as to Defendant Decatur City Board of Education.

**DONE** and **ORDERED** this June 19, 2019.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE